**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CESAR E. CALDERON, JULIO OSWALDO CARRERA, JOSE LUIS MARTINEZ, CHRISTOPHER VILLARREAL, and DAVID GARCIA,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 12 C 3793** |
| **J. YOUNES CONSTRUCTION LLC and JOHN YOUNES,** | ) ) ) ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

On May 29-30, 2013, the Court conducted a bench trial on plaintiffs' claims under

the Fair Labor Standards Act (FLSA) and the Illinois Minimum Wage Law (IMWL). This

constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule

of Civil Procedure 52(a)(1).

**Facts**

Plaintiffs Cesar Calderon, Julio Carrera, Jose Martinez, Christopher Villarreal,

and David Garcia each worked for defendant J. Younes Construction LLC (JYC) on

during various periods in 2010-2012. Each of them performed various types of

construction and maintenance work. Each of the plaintiffs worked exclusively for JYC

during the relevant periods.

Defendant John Younes is JYC's sole owner. The Court found credible his

testimony that he was not involved in the company's day to day operations during 2010-

2012.  Rather, John Younes delegated those responsibilities to his father Joseph

Younes, who ran the business on a day to day basis during 2010-2012.  John Younes

was actively involved in co-managing the business with his father during 2007-2008,

after he founded the business.  He continues to maintain the company's financial

records and has hiring and firing authority, though there is no evidence that he

exercised that authority during 2010-2012.

Each of the plaintiffs was hired by Joseph Younes.  None of the plaintiffs had an

employment contract.  Mr. Younes's testimony that he told the plaintiffs they were

independent contractors was not credible.  The Court does accept, however, that Mr.

Younes told the plaintiffs that they would be responsible for their own taxes.  This was

consistent with the way in which JYC actually paid each of the plaintiffs.

JYC set the plaintiffs' work schedules.  The Court did not find credible Joseph

Younes's testimony that each worker's schedule was up to the worker.  Rather, the

Court found credible the plaintiffs' testimony that their work schedules were determined

by JYC.  If a worker wanted a day off or wanted to leave work early, he had to obtain

permission from JYC, typically from Joseph Younes.

Most, and possibly all, of the work the plaintiffs did was performed at an office

building located at 9 South Wabash in downtown Chicago.  JYC had a contract with the

building's owner to perform construction and maintenance work there.  The contract

was not introduced in evidence.  The particular jobs to be performed by JYC were

determined by a representative of the owner (or perhaps the owner himself), a man

identified by both sides during the trial only as "Joe."  The Court will refer to this man as

the building owner's representative.

Some of JYC's workers – not the plaintiffs – worked as *de facto* foremen or supervisors.  The Court will refer to them as foremen.  The foremen spoke English, or at least better English than the plaintiffs and other workers.

The work assignments to be performed by the plaintiffs were determined, for the most part, by Joseph Younes, though at times the assignments were determined or at least communicated by the building owner's representative.  The plaintiffs spoke little English.  Work assignments typically were communicated to the plaintiffs by Joseph Younes or by one of the JYC foremen.  The foremen also had the responsibility of keeping track of each worker's hours.

The plaintiffs did not provide their own tools or materials.  Joseph Younes admitted on direct examination that JYC provided building materials and tools for the workers.  He would direct JYC workers, including the plaintiffs, to purchase construction materials and other supplies from retail stores such as Home Depot.  When the plaintiffs went to purchase materials and supplies, they used Mr. Younes's truck to go back and forth to the store and haul the items purchased, and they also used his debit or credit card to make the purchases.  In other words, they did not pay for the supplies themselves.  The workers did not determine what to purchase and when on their own.  Rather, the purchases were made at the direction of Joseph Younes.  The Court found credible the workers' testimony that they made these excursions but not their testimony regarding the frequency of the excursions, which was exaggerated.

Each of the plaintiffs worked with, handled, and installed materials that were manufactured outside the United States.  These included flooring materials (typically tile) and lighting fixtures, as well as other items.

Each of the plaintiffs was paid by a check issued by JYC and given to them by Joseph Younes. Their pay was calculated on an hourly basis, not by a preset price or by the job. JYC did not withhold payroll taxes from the worker's pay. The company also did not provide any of the plaintiffs with either a W-2 form or a 1099 form showing his worker's annual pay.

Joseph Younes's practice was to ask the workers, including some or all of the plaintiffs, for a Social Security number or tax identification number. This was done at the time they were hired and again after the end of the calendar year. None of the plaintiffs provided JYC with this information, and no one from JYC pressed the point. They were paid nonetheless.

Plaintiff Julio Oswaldo Carrera was paid $8 per hour at all relevant times. Plaintiff David Garcia Gamboa started at $7.15 per hour and later got a raise to $7.75 per hour. Plaintiff Jose Martinez was paid $8 per hour at the outset of his tenure with JYC and later got a raise to $8.50 per hour. Plaintiff Cesar Calderon likewise started at $8 per hour and later got a raise to $8.50 per hour. Plaintiff Christopher Villarreal was paid $8 per hour at all relevant times.

Each of the workers worked more than forty hours per week on a regular basis. None of them was paid extra for overtime work. Rather, they were compensated at the same hourly rate for all of their work. As indicated earlier, their time was kept by one of the JYC foremen. None of the workers kept his own time.

Some of the workers were, at times, permitted to sell scrap metal recovered during demolition at the worksite. There was conflicting testimony regarding what became of the proceeds. The court finds that the workers were allowed to keep some

4

modest portion of the proceeds.

Carrera was still working for JYC at the time this suit was filed. At the behest of Joseph Younes, the building owner's representative spoke with Carrera about the lawsuit after it was filed. The owner's representative expressed a negative reaction to the filing of suit and tried to talk Carrera into dropping his claims.

Villarreal was also still working for JYC at the time this suit was filed. He testified credibly that the way that he was treated on the job changed once JYC became aware of the lawsuit, and in particular he was subjected to closer supervision. Both Joseph Younes and the building owner's representative told Villarreal they were upset by the lawsuit and his participation in it.

After JYC was served with summons, and likely after some short period of time in which the company decided how to react, Joseph Younes caused the preparation of a document that amounted to a release or waiver of claims. He did not retain a copy of the draft release / waiver. Exactly who prepared the document is unclear, and Joseph Younes was highly evasive regarding its preparation during his testimony at trial. His testimony about the document was not credible, and his evasiveness on this subject detracted from his credibility on other topics.

After the draft release was presented to Carrera, he took a photograph of it with his cell phone. The Court admitted into evidence a printout of that photograph after finding it to be an accurate copy of the document, the original of which was no longer available.

The release / waiver, Plaintiffs' Exhibit 10, reads as follows:

AFFIDAVIT OF

Christopher Villarreal [sic]

I, Julio Oswaldo Carrera [sic], being of sound mind and body, and in no way being unduly influenced, coerced, or made to believe that it was necessary for my wellbeing [sic] or the wellbeing [sic] of my friends, family and associates, or any other individual or entity that is connected with me, freely state and being sworn say:

1.      with respect to the matter of Cesar E. Calderon, Julio Carrera, Jose Luis Martinez and Christopher Villarreal v. J. Younes Construction and John Y. Younes, also known as case number 1:12-CV-3793 in the United States District Court, Northern District of Illinois:

        a.      I wish to withdraw myself as a Plaintiff in said case number 1:12-CV-3793;

        b.      I will not bring a cause of action against J. Younes Construction and John Y. Younes, in either the Federal court system or Illinois court system – as relating to the time that I have provided services to J. Younes Construction and or John Y. Younes – for:

                i.      violation of the Fair Labor Standards Act – Overtime Wages;

                ii.      violation of the Illinois Minimum Wage Law – Overtime Wages;

                iii.      violation of the Illinois Minimum Wage Law – Minimum Wages;

                iv.      violation of any other Federal or Illinois law concerning wages.

2.      I will not bring an arbitration or mediation matter before any hearing body for wage related issue [sic] concerning the time that I have provided services to J. Younes Construction and John J. Younes.

Further affiant sayeth not.

_____
Julio Oswaldo Carrera [sic]

Witness                                    Witness

6

Subscribed and sworn to before me this _____ day of June, 2012.

_____
Notary public

At Joseph Younes's behest, the building owner's representative presented both Carrera and Villarreal with a copy of this document and asked them to sign it. Villarreal also testified credibly that Joseph Younes presented the document to him on a second occasion and again asked him to sign it. Neither Carrera nor Villarreal agreed to sign the document. Both were terminated shortly after their refusals. Both plaintiffs testified credibly that Joseph Younes told them they were being terminated because they would not withdraw their legal claims.

The Court did not find credible Joseph Younes's testimony on direct examination that he terminated Villarreal due to lack of sufficient work and Carrera for performance based reasons. He testified Villarreal continued to work for JYC for three more months after he declined to sign the release that Joseph had asked him to sign. Joseph's testimony on this point was false; indeed, it was demonstrably untrue. Court records reflect that John Younes was served with the complaint and summons for himself and JYC on May 28, 2013. It is reasonable to infer that the Youneses took some short amount of time after this to determine what to do. It is likewise reasonable to infer that it took some short amount of time to procure the drafting of the release / waiver document. The document appears to have been prepared in June 2012; that is the date that appears in the *jurat* clause at the bottom of the document.[1] JYC's records regarding the dates and amounts of payments to the plaintiffs, which were prepared by its accountant based on records from the company's checking account and consultation

---

[1] The docket reflects that the attorney for JYC and John Younes filed his appearance on June 20, 2012, between the dates of Villarreal's and Carrera's terminations.

with Joseph Younes, established that Carrera's last paycheck was dated June 23, 2012 and that Villarreal's last paycheck was dated June 16, 2012. In later testimony, Joseph Younes admitted that Carrera's last date working for JYC was the date of his last paycheck. Thus the evidence establishes that the plaintiffs were terminated in mid-June, not three months after the filing of the suit as Joseph Younes tried to maintain.

Joseph Younes's false exculpatory testimony on this point is evidence of consciousness of guilt on the question of retaliatory termination. Moreover, in later testimony, Younes virtually conceded that the termination was associated with the lawsuit, or at least with these employees' apparent attempts to get others to join the lawsuit

Plaintiff Villarreal was out of work for approximately four months. He testified credibly that he typically made about $1600 per month and that as a result, his lost wages amounted to $6400. He stated that as a result of his unemployment, he got behind on his bills and other financial obligations. It took Carrera a little under six weeks to get another job after he was terminated. He testified credibly that his lost wages totaled $1600. Neither Carrera nor Villarreal gave any testimony regarding emotional distress.

As already indicated, the Court did not find Joseph Younes to be a particularly credible witness on certain key contested issues. In addition to the points noted above, he flipped back and forth on whether the time records prepared by JYC's accountant are accurate. The Court finds that they are. Mr. Younes ultimately testified, and the Court accepts, that the records were prepared after the fact by dividing the total amount of each paycheck by the particular employee's hourly rate. Understood thus, the

records were unfavorable to JYC because they established that workers had worked more than forty hours in numerous weeks without being paid time-plus-one-half and that in some instances they had worked for less than the applicable minimum wage. Mr. Younes's earlier testimony that the records were inaccurate represented, in the Court's view, a false exculpatory statement aimed at trying to evade the time records' implications. Second, as indicated earlier, Mr. Younes gave false testimony regarding the dates of termination of the two plaintiffs who were still working for the company at the time JYC was served with the lawsuit. In these and other respects, Mr. Younes appeared to the Court to be attempting to tailor his testimony to the perceived needs of the moment.

## Discussion

Plaintiffs have asserted four claims in their amended complaint. Their first claim is a claim under the Fair Labor Standards Act for unpaid overtime wages. Their second claim is a parallel claim under the Illinois Minimum Wage Law. Plaintiffs' third claim is a claim under the IMWL for failure to pay minimum wages. Finally, plaintiffs Carrera and Villarreal have asserted a claim under the FLSA in which they allege that defendants terminated them in retaliation for asserting their rights under the FLSA.

### A.    Unpaid overtime claims

The FLSA requires employers to pay their employees a minimum hourly wage and one-and-one-half times the employee's hourly rate for any hours worked in a given week over forty hours. 29 U.S.C. §§ 206(a)(1) & 207(a)(1). These requirements apply if the employee is employed in an enterprise engaged in commerce or if the employee himself is engaged in commerce. *Id.*

Among the disputed issues in this case are whether the FLSA's "commerce" requirement is met and whether the plaintiffs were employees of JYC and of John Younes.

### 1.    Commerce requirement

As just indicated, the FLSA's requirements apply to an employee if he is employed in an enterprise engaged in commerce or if the employee himself is engaged in commerce.  29 U.S.C. §§ 206(a)(1) & 207(a)(1).  "Commerce" is defined as trade, commerce, transportation, transmission, or communication among the states or between any state and any place outside that state.  *Id.* § 203(b).   An enterprise engaged in commerce is one that "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person . . . ."  *Id.* § 203(s)(1)(A)(i).

Plaintiffs have easily established FLSA coverage by a preponderance of the evidence.  They credibly testified that they handled materials that were produced outside the United States.

### 2.    Employees vs. independent contractors

The more hotly disputed issue concerns whether the plaintiffs were "employees" of JYC.  Defendants contend that they were independent contractors.  They rely, in part, on Joseph Younes's statements to the workers that they were responsible for their own taxes and on JYC's non-withholding of payroll taxes from the workers' pay.

The defendants' subjective beliefs and the labels they claim to have attached to the workers (contractor as opposed to employee) are not determinative.  "[S]tatus as an

'employee' for purposes of the FLSA depends on the totality of the circumstances rather than on any technical label . . . ." *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992). The FLSA's statutory definitions regarding employment "are broad and comprehensive in order to accomplish the remedial purposes of the Act." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). The common law definitions of employee and independent contractor do not govern. *Id.*

To determine whether a worker is an employee within the meaning of the FLSA, a court "must examine the economic reality of the working relationship." *Vanskike*, 974 F.2d at 808 (internal quotation marks omitted); *Lauritzen*, 835 F.2d at 1534. "[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service." *Id.* (internal quotation marks omitted).

The Seventh Circuit has stated that

> [i]n seeking to determine the economic reality of the nature of the working relationship, courts do not look to a particular isolated factor but to all the circumstances of the work activity. Certain criteria have been developed to assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling.
>
> Among the criteria courts have considered are the following six:
>
> 1)      the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> 2)      the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3)      the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> 4)      whether the service rendered requires a special skill;
>
> 5)      the degree of permanency and duration of the working relationship;

6)      the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1534-35 (citation omitted).  *See also See Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 565 (7th Cir. 2009).

These factors weigh strongly in favor of a finding that the plaintiffs were employees of JYC.  First, JYC, not the workers, had control over the manner in which the work was performed.  Indeed, Joseph Younes testified that the employees typically were not at the work site at times when he was not there.  The workers also testified credibly that their work assignments were directed by Younes and, in some situations, the JYC foremen.  Second, the workers had no opportunity for profit or loss; they were paid a fixed wage.  The fact that they may have, on occasion, been able to sell scrap metal recovered in doing demolition and sometimes to keep some modest part of the proceeds is of little consequence, given the infrequency of those events.  Third, the workers had no investment in equipment or materials; it is undisputed that these were provided by JYC.  In addition, none of the plaintiffs employed others.  Rather, all workers were hired by JYC.

Fourth, without minimizing the degree of skill required by the workers, they were performing basic construction work.  There is no indication that they had specialized skills or training.  Fifth, the work relationship had significant duration and permanency.  The workers performed work only for JYC.  They worked regular schedules of over forty hours per week for significant periods of time.  Sixth, the services the workers rendered was integral to JYC's business.  The company could not have performed its construction and maintenance contract without the plaintiffs and other workers with whom JYC dealt on a similar basis.

The only factor shown by the evidence that suggests an independent contractor relationship involves the absence of withholding of payroll taxes. This factor is not determinative and does not outweigh the others discussed above. Making this factor determinative would permit an unscrupulous employer to evade its obligations under the FLSA simply by not complying with federal and state tax laws. The arrangement between JYC and the plaintiffs under which they were paid without withholding was no doubt considered mutually beneficial, at least in the short run: JYC saved on payroll taxes, and the workers got their gross pay, not a lower amount after withholding of taxes. But even if there was a mutual intent to evade federal and state income tax laws and the Social Security Act, that does not determine a worker's status as an employee as opposed under the FLSA.

In sum, considering the totality of the circumstances and the factors set out by the Seventh Circuit, the Court finds that plaintiffs have proved by a preponderance of the evidence that they were employees of JYC, not independent contractors or subcontractors.

### 3.    FLSA compliance

The payroll records prepared by JYC show on their face that each of the plaintiffs regularly worked over forty hours per week but was not paid time-and-one-half for those hours. Plaintiffs have proven by a preponderance of the evidence that JYC violated the FLSA for each of those weeks.

### 4.    Liability of John Younes

The remaining disputed liability issue regarding plaintiffs' overtime pay claims concerns the individual liability of John Younes. This turns on whether plaintiffs have

13

proven that he is an "employer" within the meaning of the FLSA. The FLSA's definition of employer is "expansive[ ]." *Falk v. Brennan*, 414 U.S. 190, 195 (1973).

An individual may be considered an employer under the FLSA if he has supervisory authority over the employee and is at least partly responsible for the statutory violation. *See* 29 U.S.C. § 203(d); *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987). The ability to exercise control over the aspect of employment that gave rise to the statutory violation is the key factor. *See, e.g., Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991). Control over the entity's day to day operations is not required. *Id.*

John Younes was, at all relevant times, JYC's sole owner and member. During the years when the plaintiffs were employed by JYC, he was essentially an absentee owner. He testified credibly that he had nothing to do with the company's operations during that period. Rather, he delegated that responsibility to his father, Joseph Younes, whom John Younes employed on behalf of JYC.

John Younes testified, however, that he ran JYC with his father's assistance during the years 2007-2008, when the company was founded.[2] He had no direct role in determining the pay of any of the plaintiffs in this case. Joseph Younes testified, however, that the way in which he dealt with the plaintiffs was the way he had "always" worked. "Always" quite clearly covers the period when he was co-managing the company with his son John, the company's owner. Joseph Younes's testimony permits a reasonable inference that JYC's practice of noncompliance with the FLSA and IMWL was established and existed during the earlier period in which John Younes was

---

[2] John Younes withdrew from day to day operations when business turned down, leaving daily management to his father.

running the company's day to day operations.  During the years when the plaintiffs were employed by JYC, Joseph Younes carried on this established practice, acting on behalf of his son, the company's owner.  The Court finds based on this evidence that John Younes was aware of, helped establish, and condoned the practice of non-compliance with the FLSA that plaintiffs established at the trial in this case.

John Younes also testified that he had the power to hire and fire workers (though he said he did not exercise this power during the years in question) and that he maintained JYC's financial records and signed the company's tax documents.

These factors, taken together, are sufficient to establish by a preponderance of the evidence that John Younes was an employer of the plaintiffs who is individually liable under the FLSA for unpaid overtime compensation, even though he did not deal directly with any of them.  *See, e.g., Herman v. RSR Security Servs. Ltd.*, 172 F.2d 132, 139 (2d Cir. 1999) (identifying factors used to determine whether one is an employer under the FLSA).

### 5. FLSA liquidated damages

An employer that violates the FLSA's overtime pay requirements is liable not just for the unpaid amount but also "an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  Liquidated damages are presumptively appropriate for an FLSA violation.  *See Urnikis-Negro v. American Family Property Servs.*, 616 F.3d 665, 672 (7th Cir. 2010).  A court "may choose not to award liquidated damages where the employer shows that it acted in good faith with reasonable grounds to believe that its actions did not violate the FLSA."  *Bankston v. State of Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995).

Defendants have offered no evidence that they acted in good faith or with reasonable grounds to believe they were complying with the law. Essentially the only evidence they offered on this score is Joseph Younes's testimony that the manner in which he paid the plaintiff employees was the way he had always conducted the business. This is hardly evidence of good faith. As the Court has indicated, defendants and plaintiffs may have entered into a relationship that was in their short term mutual interest – because tax withholding obligations were avoided – but that does not suggest good faith, let alone that defendants had reasonable grounds to believe they were complying with the FLSA. Plaintiffs are entitled to liquidated damages on their FLSA unpaid overtime claim.

### 6. IMWL overtime claim

Liability for unpaid overtime compensation under the IMWL is determined by the same standards that govern liability under the FLSA. *See, e.g., Villarreal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011). The Court finds both JYC and John Younes liable to plaintiffs under the IMWL for failure to pay overtime wages for the reasons described with regard to the FLSA.

Under the IMWL, an employee who is not paid as the statute requires is entitled to recover the amount of the underpayment, plus "damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid." 820 ILCS 105/12(a). It would appear that this penalty is imposed over and above the damages, including liquidated damages, that are available under the FLSA. Defendants do not argue otherwise.

### B. IMWL minimum wage claim

16

Illinois requires a higher minimum hourly wage than the one established by the FLSA, and the higher state minimum controls. See 29 U.S.C. § 218(a). During the period at issue in this case, the Illinois minimum wage was $8.25 per hour. See 820 ILCS 105/4(a).

The plaintiffs proved that each of them was paid less than the Illinois minimum wage for at least some pay periods, as established by JYC's payroll records that were admitted in evidence. JYC's liability is established by the Court's finding that the plaintiffs were employees of the company and the payroll records showing the applicable pay rates. JYC is liable for the unpaid amounts as well as the two percent penalty previously discussed.

Plaintiffs failed to establish John Younes's liability for the minimum wage violation. As indicated earlier, there is no evidence that he was involved in setting pay rates for the plaintiffs or for other workers during 2010-2012. In contrast to the Court's finding regarding non-payment of overtime pay, the evidence regarding John Younes's earlier involvement in day to day management and Joseph Younes's testimony that he dealt with the plaintiffs as he always had with other employees is insufficient to establish the requisite degree of involvement or control over the setting of hourly pay rates. Among other things, the company's records reflect that some plaintiffs were, during some periods, paid more than the minimum wage. Thus there was no consistent practice of below-minimum-wage pay.

## C.  FLSA retaliation claim

The FLSA makes it unlawful for an employer to discharge or discriminate against an employee for asserting a claim under the statute. 29 U.S.C. § 215(a)(3). A plaintiff

in an FLSA retaliation case may prove his claim by direct or indirect evidence. *See, e.g., Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012).

It is undisputed that Carrera and Villarreal engaged in protected action – they filed and prosecuted this suit – and suffered an adverse employment action after doing so – they were terminated after they declined to drop their claims. The question is whether they have proven a causal link between their protected expression and their termination. *See id.* A plaintiff may rely on direct evidence of a causal link or on circumstantial evidence that permits an inference of retaliation, such as evidence of suspicious timing, ambiguous statements or behavior; evidence that similarly situated employees were treated differently; or a pretextual reason for adverse employment action. *See id.* at 973.

Carrera and Villarreal have offered credible direct evidence of a causal link between their filing of this suit and their termination by JYC. Both plaintiffs testified credibly that shortly after they declined to sign the release form Joseph Younes had caused to be prepared dropping their case, Younes told them that they were terminated because of this lawsuit.

In addition, as the Court has previously noted, Joseph Younes's false exculpatory testimony that the plaintiffs continued to work for months after they declined to sign the release / waiver constitutes evidence of consciousness of guilt. This testimony was demonstrably false, as the Court has described. The Court also regards Mr. Younes's evasiveness regarding the preparation of the release / waiver as evidence supporting a finding that he deliberately terminated the plaintiffs because they were

18

pursuing their rights under the FLSA. Finally, as the Court has noted, Mr. Younes ultimately gave testimony that expressly connected the plaintiffs' terminations to their exercise of rights under the FLSA.

For these reasons, JYC is liable to plaintiffs for unlawful retaliation in violation of the FLSA. Plaintiffs failed to establish, however, John Younes's liability for this violation. There is no indication that he played any role either in the preparation of the release / waiver document, its presentation to the two plaintiffs, or the decision to terminate them. And there is no evidence that he had anything to do with the establishment of any policies or practices of the company that Joseph Younes carried out in terminating Carrera and Villarreal.

**D.     Damages**

The Court finds that the summary chart prepared by plaintiffs accurately sets forth their damages for the unpaid overtime and minimum wage violations, including unpaid wages, liquidated damages under the FLSA, and IMWL penalties. Plaintiffs' counsel will need to provide the Court with revised figures regarding John Younes, however, to reflect the fact that the Court has found him liable only for the overtime pay violations, not the minimum wage violations.

A prevailing plaintiff on a FLSA retaliation claim may recover lost wages, an equal amount as liquidated damages, and other types of compensatory damages, such as for emotional distress, and punitive damages. *See* 29 U.S.C. § 216(b); *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1226 (7th Cir. 1995) (citing *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 111-12 (7th Cir. 1990)). As indicated earlier, liquidated damages are presumptively available for FLSA violations.

19

Defendants have offered no evidence that they acted in good faith or with reasonable grounds to believe that they were not violating the FLSA; indeed, the contrary was true.

The Court awards plaintiff Carrera $1,600 in lost wages on the retaliation claim, plus another $1,600 in liquidated damages and awards plaintiff Villarreal $6,400 in lost wages plus $6,400 in liquidated damages. Neither plaintiff offered evidence of emotional distress arising from the termination, so the Court awards no damages in that regard. The Court does not award punitive damages because the liquidated damages are sufficient to punish and deter JYC for its deliberate violation of the FLSA's anti-retaliation provision.

## Conclusion

For the reasons stated above, the Court finds in favor of all plaintiffs and against defendants J. Younes Construction and John Younes on plaintiffs' FLSA and IMWL unpaid overtime claims (Counts 1 and 2); in favor of all plaintiffs and against J Younes Construction on plaintiffs' IMWL minimum wage claims (Count 3) but in favor of John Younes on that claim; and in favor of plaintiffs Carrera and Villarreal and against J Younes Construction on plaintiffs' FLSA retaliation claims (Count 4) but in favor of John Younes on that claim. Plaintiffs' counsel is directed to promptly recalculate the damage award against John Younes in light of the Court's finding in his favor on certain claims. The revised calculation is to be filed by no later than June 25, 2013. As an attachment to that submission, plaintiffs' counsel is to attach the summary chart regarding damages provided to the Court at the time of closing arguments so that the chart will be part of the record in the case. A status hearing is set for June 27, 2013 at 9:30 a.m. for the purpose of entry of a final judgment and setting a schedule for briefing the issue of

attorney's fees.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 23, 2013